UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BENJAMIN C. BAIRD,

Plaintiff,

v.

RICHARD J. EHLERS, et al.,

Defendants.

CASE NO. C10-1540JLR

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND PLAINTIFF'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT

## I.  INTRODUCTION

Before the court are two motions:  Defendants Richard J. Ehlers ("Deputy Ehlers") and King County's motion for summary judgment (Dkt. # 24), and Plaintiff Benjamin C. Baird's motion for partial summary judgment or in the alternative motion *in limine*.  (Dkt. # 21).  Defendants seek summary judgment (1) declaring that Defendant Deputy Richard C. Ehlers is entitled to qualified immunity with respect to Mr. Baird's 42 U.S.C. § 1983 claim, (2) dismissing Mr. Baird's state law claim for assault, and (3) dismissing Mr. Baird's claim for damages arising out of his broken clavicle.  Defendants also seek to

exclude Mr. Baird's police procedures expert from testifying at trial. Mr. Baird has

moved for partial summary judgment with regard to Defendants' defense that Mr. Baird

injured his clavicle after he was placed in jail following his encounter with Deputy Ehlers,

or *in limine* to exclude any evidence of a fall by Mr. Baird at the jail.

Following the oral argument of counsel on November 16, 2011, the court stated on

the record its intention to grant Defendants' motion declaring that Deputy Ehlers is

entitled to qualified immunity with respect to Mr. Baird's 42 U.S.C. § 1983 claim. On

November 17, 2011, the parties filed a stipulated motion dismissing Mr. Baird's state law

claims, without prejudice to Mr. Baird's right to appeal the court's ruling on qualified

immunity. (Dkt. # 52.) The court's order granting the parties' stipulated motion (Dkt. #

53) renders Mr. Baird's motion moot, and the court therefore DENIES it as MOOT (Dkt.

# 21). The order also renders much of the relief sought in Defendants' motion moot,

including the dismissal of Mr. Baird's state law claims, the dismissal of Mr. Baird's claim

for damages arising out of his broken clavicle, and the exclusion of Mr. Baird's police

procedures expert from testifying at trial. Accordingly, the court DENIES these portions

of Defendants' motion as MOOT as well. The only aspect of the forgoing motions that

remains for the court to decide is Defendants' motion concerning the issue of qualified

immunity.

Having carefully considered Defendants' motion for qualified immunity, all

documents filed in support and opposition thereto, the applicable law, and having heard

the oral argument of counsel on November 16, 2011, the court GRANTS Defendants'

motion establishing on summary judgment the qualified immunity of Deputy Ehlers with respect to Mr. Baird's 42 U.S.C. § 1983 claim.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

**A.  Procedural History**

Mr. Baird initiated this action in King County Superior Court on September 2, 2010.  (Not. of Removal (Dkt. # 1) Ex. A (Compl.).)  Mr. Baird alleged a violation of his federal civil rights pursuant to 42 U.S.C. § 1983,[1] and state law claims for false arrest, assault, and malicious prosecution, arising out of a confrontation on November 23, 2009, between himself and Deputy Ehlers, who is a King County Sheriff's Deputy.  (*Id.*)  On September 24, 2010, Defendants removed the action to Federal District Court for the Western District of Washington.  (*Id.*)  Mr. Baird subsequently voluntarily dismissed his state law claims for false arrest and malicious prosecution.  (Dkt. # 18.)  As discussed above, on November 17, 2011, the parties' filed a stipulated motion for dismissal of Mr. Baird's state law claims, and the court granted it.  (Dkt. ## 52, 53.)  Thus, the only claim remaining at summary judgment is Mr. Baird's § 1983 claim against Deputy Ehlers.

**B.  The Events of November 23, 2009**

There is no dispute that Mr. Baird spent most of his day on November 22, 2009, consuming alcohol, and that by the time he encounters Deputy Ehlers on a metro bus shortly after midnight on November 23, 2009, Mr. Baird is in a "drunken stupor."  (*See*

---

[1] Mr. Baird did not allege a § 1983 claim against King County.  (*See* Not. of Removal ¶ 3 & Ex. A (Compl.) ¶ 6.1.)

Plaint. Resp. (Dkt. # 36) at 2 ("There is no dispute that Mr. Baird was drunk, marginally responsive and that he was staggering . . . ."); Bundy Decl. (Dkt. # 25) Ex. 1 (Baird Dep.) at 32 (". . . I'm in a . . . the honest word I can say is a drunken stupor . . . .").)  Mr. Baird has testified that during portions of the relevant interactions between himself and Deputy Ehlers he "was just kind of like in a daze," that he "[does not] remember talking with a policeman," and that he "[does not] know what's going on." (*Id.* at 29, 32.)  Despite Mr. Baird's inability to provide meaningful testimony concerning many of the events on November 23, 2009, Mr. Baird's counsel asserts that a videotape of the encounter between Mr. Baird and Deputy Ehlers "shows conflicting facts from those presented by Deputy Ehlers." (Plaint. Resp. at 2.)  Accordingly, the court views the facts as depicted by the videotape, and with regard to the Defendants' motion for summary judgment views the remainder of the evidence in the light most favorable to Mr. Baird.[2]

There is no dispute that on November 22, 2009, after drinking for much of the day, Mr. Baird boards a metro bus and rides it to the end of the bus line in Tukwila, Washington.  The events on the bus are recorded via videotape, which includes four camera locations.  (Bundy Decl. Ex. #3 (Video).)  The bus reaches its destination a few

---

[2] In the context of a motion for summary judgment, the court "must credit the video evidence submitted by [the parties], and consider all evidence in the light most favorable to [the non-moving party]." *Menotti v. City of Seattle*, 409 F.3d 1113, 1150 (9th Cir. 2005) (on summary judgment, the court "must credit the video evidence submitted by [the non-moving party], and consider all evidence in the light most favorable to [the non-moving party]"); *Fillmore v. Sharp*, No. 2:10cv00620 JWS, 2011 WL 5191369 (D. Ariz. Nov. 2, 2011) ("Where video evidence contradicts a party's version of the events, on a motion for summary judgment a court must accept the facts as depicted by the video . . . .") (citing *Scott v. Harris*, 550 U.S. 372, 379, 380-81 (2007)).

minutes before midnight, and all of the passengers exit the bus except for Mr. Baird. (*Id.* Ex. 3 (Video) Camera One at 23:56:40.)

Once the driver, Ms. Kimber Dale, realizes that Mr. Baird has not exited the bus with the other passengers, she shouts at him repeatedly that he needs to get off the bus. (Bundy Decl. Ex. 3 (Video) Camera One at 23:58:59 and following; Camera Two at 23:57:58 and following; *see* Dale Decl. (Dkt. # 29) at ¶2.) On the video, Mr. Baird does not appear to be unconscious, but does not respond in any meaningful way to Ms. Dale's repeated instructions either. Accordingly, Ms. Dale calls for assistance. (Dale Decl. at ¶ 2.)

Approximately ten minutes later, Deputy Ehlers enters the bus from behind where Mr. Baird is seated, approaches Mr. Baird and tells him that he needs to get off the bus. (Bundy Decl. Ex. 3 (Video) Camera Two at 00:12:49 and following.) Deputy Ehlers has testified that he could smell that Mr. Baird had been drinking. (Ehlers Decl. (Dkt. # 26) ¶ 2.) Again, although he does not appear to be unconscious, Mr. Baird does not reply to Deputy Ehlers instructions in any meaningful way, and does not comply with Deputy Ehlers's orders to exit the bus. (Bundy Decl. Ex. 3 (Video) Camera Two at 00:12:49 and following.) Deputy Ehlers proceeds to lift Mr. Baird out of his seat, place Mr. Baird in an escort hold known as a gooseneck counter-joint lock, and maneuver Mr. Baird off the bus. (Ehlers Decl. at 2; Bundy Decl. Ex. 3 (Video) Camera Two at 00:13:04.)

Deputy Ehlers has testified that Mr. Baird physically resisted his efforts to remove him from the bus. (Ehlers Decl. at 2.) However, viewing the video evidence, Mr. Baird's physical response, or lack thereof, to Deputy Ehlers's efforts to maneuver him off the bus

could be interpreted merely as his extreme intoxication, and not as an effort to affirmatively resist Deputy Ehlers's attempts to remove him from the bus. (Bundy Decl. Ex. 3 (Video) Camera Two at 00:13:06 and following; Camera One at 00:13:14 and following.) In addition, Mr. Baird's free arm remains at his side, which would appear to be inconsistent with any effort on Mr. Baird's part to actively resist Deputy Ehlers. (*Id.*) Richard Wolf, a bystander who observed a portion of the altercation between Mr. Baird and Deputy Ehlers, has also testified that, at this point in the course of events, Mr. Baird was not struggling with Deputy Ehlers, was resisting "maybe more with body language than actually physically," and appeared "hung over" and a little woozy. (Bundy Decl. Ex. 9 (Wolf Dep.) at 15.)

Once Deputy Ehlers succeeds in getting Mr. Baird off the bus, Deputy Ehlers testifies that Mr. Baird suddenly turns towards him and that he took this movement as a threat to his safety.[3] (Ehlers Decl. ¶ 4; Bundy Decl. Ex. 3 (Video) Camera One at 00:13:24 – 00:13:25.) Deputy Ehlers has testified that he responded to this alleged threat by "immediately and instinctively grabb[ing] Mr. Baird," "push[ing] him over [his] knee," and "tripping him to the ground." (*Id.*) Deputy Ehlers has also testified that he "controlled [Mr. Baird's] fall, guiding him to the ground so that he did not hit with the full force of his significant body weight." (*Id.*)

The video evidence is consistent with Deputy Ehlers's testimony concerning his own movements and the controlled manner in which he guided Mr. Baird to the ground.

---

[3] Mr. Wolf has also testified that Mr. Baird was "struggling" and starting to be "uncooperative" at this point in the altercation. (Bundy Decl. Ex. 9 (Wolf Dep.) at 15, 16.)

(Bundy Decl. Ex. 3 (Video) Camera One at 00:13:22 and following.)  The video, however, could be interpreted contrary to Deputy Ehlers's testimony with regard to Mr. Baird's movements.  (*Id.*)  Once again, Mr. Baird's movements could be interpreted simply as consistent with his extreme state of inebriation, rather than as an attempt to threaten or harm Deputy Ehlers.  (*Id.*)  Further, Mr. Baird again makes no use of his free arm during this period of time, which would also seem inconsistent with an effort to threaten or deliberately struggle with Deputy Ehlers.  (Bundy Decl. Ex. 3 (Video) Camera One at 00:13:20-25.)  Indeed, Deputy Ehlers admits that, although Mr. Baird had a free hand at the time, Mr. Baird did not take a swing at him.  (Diamondstone Decl. (Dkt. # 35) Ex. 5 (Ehlers Dep.) at 15.)

The videotape indicates that as he was escorting Mr. Baird off the bus, Deputy Ehlers repeatedly tells Mr. Baird to "get up, get up."  His last directive to Mr. Baird to "get up" is recorded on the videotape at 00:13:21-22.  (Bundy Decl. Ex. 3 (Video) Camera One at 00:13:21-22.)  Deputy Ehlers then instructs Mr. Baird to "calm down."  (*Id.* at 00:13:24; Diamondstone Decl. Ex. 5 (Ehlers Dep.) at 15.)  However, he maneuvers Mr. Baird to the ground within just one or two seconds of that new directive.  (*Id.* at 00:13:23-25.)

Deputy Ehlers has testified that once Mr. Baird was on the ground, Mr. Baird immediately tried to kick and punch him.  (Ehlers Decl. ¶ 4.)  In reaction, Deputy Ehlers testifies that he let go of his hold on Mr. Baird and stepped back, and that Mr. Baird then jumped to his feet.  (*Id.*)  Mr. Baird, however, describes his reaction to Deputy Ehlers's maneuver differently:

. . . [M]y reaction is, What's going on?  Because I'm in a – like a – you know, like a – you know, to be – the honest word I can say is a drunken stupor.  I was kind of half asleep and my reaction is I don't know if I'm being attacked because I don't remember talking with a policeman.  I don't know what's going on.  I'm shocked.  So my natural reaction is to get back on my feet again.

(Bundy Decl. Ex. 1 (Baird Dep.) at 32.)  The video evidence in this case can be interpreted consistently with either Mr. Baird's testimony or Deputy Ehlers's testimony.  (Bundy Decl. Ex. 3 (Video) Camera One at 00:13:25-00:13:28.)  However, Mr. Baird's movements on the ground and reaction in standing back up are consistent with Mr. Baird's testimony concerning his state of drunkenness, surprise, and confusion as to what is transpiring, rather than an attempt to assault Deputy Ehlers.

Once Mr. Baird jumps up, he shouts at Deputy Ehlers and says, "Mother fucker, I'll get up.  I'll get up.  I'll stand up."  (Bundy Decl. Ex. 3 (Video) Camera One at 00:13:28-38.)[4]  At this point in the altercation, the video evidence records Mr. Baird's movements, but the view of Deputy Ehlers is obscured in part by the structure of the bus.  Deputy Ehlers is standing approximately six feet away from Mr. Baird (Diamondstone Decl. Ex. 5 (Ehlers Dep.) at 15), and the two men are facing each other.  Contrary to Deputy Ehlers's report (Ehlers Decl. (Dkt. # 26) Ex. 1), which asserts that Mr. Baird was yelling with his hands clenched in fists, the video evidence is clear that Mr. Baird's hands are open, his arms are outstretched perpendicular to his sides, and raised to just below his shoulder level.  (Bundy Decl. Ex. 3 (Video) Camera One at 00:13:30-38.)  As they are standing

---

[4] Mr. Baird's counsel asserts that since this is the last directive given to Mr. Baird by Deputy Ehlers, Mr. Baird's statements cannot be interpreted as non-compliant or resistant. (Plaint. Resp. at 4.)

facing each other, Mr. Baird makes no effort to move towards Deputy Ehlers, neither does he make any effort to turn and flee. (*Id.*) Deputy Ehlers admits these facts:

> Q: Mr. Baird, in what we've seen, wasn't attempting to flee at any time, was he?
> A: Not that I know of.
> Q: Mr. Baird wasn't charging towards you, was he?
> A: Actually, I was backing away. But he had not charged towards me.
> Q: At any time did he charge towards you?
> A: Not that I recall, no.
> Q: At any time did he strike you?
> A: No, he did not strike me.

(Diamondstone Decl. Ex. 3 (Ehlers Dep.) at 59-60.)[5]

---

[5] Another eyewitness, Amber Harner testified concerning the time period that Mr. Baird and Deputy Ehlers were facing each other as follows:

> Q: . . . When the man was not complying and just standing there, did you see any movement or gestures by the man at all?
> A: No.
> Q: Did you see him approach the officer?
> A: No.
> Q: Did you see him ball up his fists?
> A: No.
> Q: Did you hear him threaten the officer in any way?
> A: No.
> Q: Did you see him try to flee?
> A: No.
> Q: You did see that he wasn't getting down to the ground as directed by the officer?
> A: Yes.
> Q: And that's the extent of the resistance that you saw at that point?
> A: Yes.

(Diamondstone Decl. Ex. 4 (Harner Dep.) at 22-23.) In addition, the eyewitness testimony of Richard Wolf is consistent with the foregoing:

> Q: At the time the officer fired the taser at the man, were the man's hands – did you see the man's hands?
> A: Yes.
> Q: And what position were they in?
> A: They were outstretched. He said, "Do it."

Deputy Ehlers, nevertheless, pulls out his taser. (Ehlers Decl. ¶ 3.) In response, Mr. Baird does not move either toward or away from Deputy Ehlers, but begins to shout, "Do it – Do it – Do it – Do it." Deputy Ehlers then tells Mr. Baird to "sit down." (Bundy Decl. Ex. 3 (Video) Camera One at 00:13:36-37; Ehlers Decl. ¶ 4.) Within just a second or two of giving the command, however, Deputy Ehlers fires his taser, and it hits Mr. Baird in the chest. (Ehlers Decl. ¶ 4 ("I . . . pulled out my [t]aser and, shortly after telling him to sit down, I deployed it, hitting him in the chest with the darts."); Bundy Decl. Ex. 3 (Video) Camera One at 00:13:28-38.) There was insufficient time for Mr. Baird to comply with Deputy Ehlers's instruction to sit down before Deputy Ehlers fired his taser.

According to Deputy Ehlers testimony, the taser dart did not disable Mr. Baird. (Ehlers Decl. ¶ 5.) On the videotape, Mr. Baird continues to stand in his same position, and appears to begin to pull the taser darts out of his chest. (*Id.* at 00:13:38-40.) Mr. Baird's expert witness on police practices, however, has testified that although Mr. Baird did not fall to the ground, he was disabled by the initial taser strike. (Bundy Decl. Ex. 17 (Burwell Dep.) at 31.) After firing his taser, Deputy Ehlers immediately moves toward Mr. Baird, applies his taser to Mr. Baird's leg in drive-stun mode, while at the same time

---

Q: As his hands were outstretched, was he threatening the officer?
A: No.
Q: Did he appear that he was about to flee?
A: No.

(Bundy Decl. Ex. 9 (Wolf Dep.) at 22.)

using his body to push or tackle Mr. Baird to ground.  (*Id.* at 00:13:40 and following;

Ehlers Decl. ¶ 5.)  The ensuing scuffle between Mr. Baird and Deputy Ehlers occurs

outside of the video camera's range, but Deputy Ehlers has testified that Mr. Baird resisted

his efforts to place him in handcuffs, and so he activated his taser two more times.  (*Id.*)

Following these two additional taser activations, Deputy Ehlers was able to place Mr.

Baird in handcuffs.  (*Id.*)  The total time between when Deputy Ehlers first fires his taser

until Deputy Ehlers is able to place Mr. Baird in handcuffs lasts approximately 60 to 75

seconds.  (Diamondstone Decl. Ex. 3 (Ehlers Dep.) at 60.)  Therefore, in the course of 60

to 75 seconds, Deputy Ehlers applied his taser to Mr. Baird once in dart form, once in

drive-stun mode, and then re-activated his taser two additional times following its initial

application in drive-stun mode to Mr. Baird's leg.  (Ehlers Decl. ¶ 5.)

Deputy Ehlers arrested Mr. Baird for unlawful bus or transit conduct under RCW

9.91.025.  (Not. of Removal Ex. A (Compl.) ¶ 5.1.)  Mr. Baird was taken to jail, and later

released from custody without being charged with any crime.  (*Id.*)  Mr. Baird, through

counsel, subsequently requested records from the King County Sheriff's Office

concerning the events of November 23, 2009.  (*Id.* ¶ 5.3.)  Shortly thereafter, on March 9,

2010, Mr. Baird was informed that he was being charged with obstruction of a law

enforcement officer for the events of November 23, 2009.  (*Id.*)  The obstruction charge

was filed in King County District Court.  (*Id.*)  King County ultimately dismissed the

obstruction charge with prejudice.  (*Id.*; *see also* SJ Mot. at 11 n. 3.)

**A.  Standards**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.

**B.  Qualified Immunity**

Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Mattos v. Agarano*, --- F.3d ---, 2011 WL 4908374, at *5 (9th Cir. Oct. 17, 2011) (*en banc*) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  In determining whether an official is entitled to qualified immunity, courts apply a two-step test:  First, the court must determine if, taking the facts in the light most favorable to the non-moving party, the officer violated one of the plaintiff's constitutional rights.  Second, if the answer to the first question is "yes," then the court must "determine whether the constitutional right was 'clearly established in light

of the specific context of the case' at the time of the events in question." *Mattos*, 2011 WL 4908374, at *5 (quoting *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009)); *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010).

### 1. Mr. Baird's Fourth Amendment Rights

Mr. Baird has alleged that Deputy Ehlers violated his Fourth Amendment rights by using excessive force on February 23, 2009. All allegations that law enforcement officers have used excessive force are examined under the Fourth Amendment and its reasonableness standard, and the framework outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (*en banc*). The Supreme Court has declared that the "reasonableness" inquiry is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him. *Graham*, 490 U.S. at 397. The court applies *Graham* by first considering the nature and quality of the alleged intrusion, and then considering the governmental interests at stake by looking at: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Mattos*, 2011 WL 4908374, at * 6.

The court's consideration of reasonableness, however, is not limited to these three factors. Rather, the court must consider the totality of the circumstances and weigh the gravity of the intrusion against the government's interest to determine whether the force employed was constitutionally reasonable. *See Miller v. Clark Cnty.*, 340 F.3d 959, 968 (9th Cir. 2003); *see also Mattos*, 2011 WL 4908374, at *6 ("[I]n assessing the

governmental interests at stake under *Graham*, we are free to consider issues outside the three enumerated . . . when additional facts are necessary to account for the totality of circumstances in a given case."). "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment . . . in excessive force cases should be granted sparingly." *Smith*, 394 F.3d at 701(quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

Like the court in *Mattos*, this court begins its analysis by considering the nature and quality of the force used against Mr. Baird. *See Mattos*, 2011 WL 4908374, at *6; *see also Chew*, 27 F.3d at 1441 (stating that the *Graham* factors "are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure."). Initially, Deputy Ehlers used an escort hold known as a gooseneck counter-joint lock, while escorting Mr. Baird off the bus. (Ehlers Decl. at 2; Bundy Decl. Ex. 3 (Video) Camera Two at 00:13:04.) Once off the bus, Deputy Ehlers pushed Mr. Baird over his knee, tripping him to the ground. (Bundy Decl. Ex. 3 (Video) Camera One at 00:13:24 – 00:13:25.) Given Mr. Baird's conduct and prior Ninth Circuit authority, the court finds that this minimal use of force was reasonable in light of all the circumstances of this case. *See, e.g.*, *Tatum v. City and Cnty. of San Francisco*, 441 F.3d 1090, 1096 (9th Cir. 2006) (officer's use of control hold to arrest plaintiff and place him in handcuffs was objectively reasonable where plaintiff disobeyed officer's commands, was verbally unresponsive, and appeared to be intoxicated or under the influence of a controlled substance); *see also Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (concluding that ample

evidence supported a jury's verdict that the use of "pain compliance techniques" to remove anti-abortion demonstrators who were blocking access to an abortion clinic was objectively reasonable).

Once Mr. Baird stands up again, however, Deputy Baird significantly escalates the level of force he employs. He draws and deploys his taser in dart-mode. (Bundy Decl. Ex. 3 (Video) Camera One at 00:13:28-38.) The Ninth Circuit has "held that tasers used in dart-mode 'constitute an intermediate, significant level of force.'" *Mattos*, 2011 WL 4908374, at *7 (quoting *Bryan,* 630 F.3d at 826). The use of such force must be justified by the governmental interest that compels its use. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). When Mr. Baird allegedly began attempting to remove the dart from his chest, Deputy Ehlers tackles Mr. Baird to the ground and applies his taser to Mr. Baird's leg in drive-stun mode. (Bundy Decl. Ex. 3 (Video) Camera One at at 00:13:40 and following; Ehlers Decl. ¶ 5.) Deputy Ehlers has also testified that while his taser was applied to Mr. Baird's leg in drive-stun mode, he activated the taser two more times before successfully placing Mr. Baird in handcuffs.

In *Mattos*, the Ninth Circuit declined to determine what level of force specifically is used when a taser is deployed in drive-stun mode. *Mattos*, 2011 WL 4908374, at *8. Nevertheless, the Ninth Circuit proceeded to determine whether the officer's use of the taser against the plaintiff was reasonable, "keeping in mind the magnitude of the electric shock at issue and the extreme pain that [the plaintiff] experienced." *Id.* Accordingly, this court also presses forward to examine the *Graham* factors in light of Deputy Ehler's use of his taser in both dart-mode and drive-stun form.

In evaluating the government's interests at stake, the court considers the first *Graham* factor, which is the severity of the crime at issue. Deputy Ehlers initially arrested Mr. Baird for improper bus or transit conduct under RCW 9.91.025. (Not. of Removal Ex. A (Compl.) ¶ 5.1.) Although the court could not find any Fourth Amendment excessive force cases involving this particular misdemeanor, the court has no difficulty in concluding that improper bus conduct is not a serious offense. *See Mattos*, 2011 WL 4908374, at *8 (noting that failure to sign a traffic citation, trespassing and obstructing a police officer, were not serious crimes). The court's conclusion is undergirded by the particular facts of this case. Mr. Baird's conduct did not involve the harassment of other passengers or the driver, or any activity that placed the operation of the bus in danger. Rather, his improper conduct consisted simply of his failure to exit the bus at the end of the line. While Mr. Baird's misconduct was likely inconvenient for the driver and other passengers (whose bus may have arrived late at subsequent stops), it does not constitute a serious crime for purposes of Fourth Amendment excessive force analysis.[6]

Next, the court considers the second *Graham* factor, which is whether Mr. Baird posed an immediate threat to the safety of the officer or others. This is the "most important single element" of the governmental interests at stake. *Mattos*, 2011 WL

---

[6] Mr. Baird was also later charged with obstructing a law enforcement officer, although the charge was later dismissed with prejudice. The Ninth Circuit has already specifically considered this charge in similar factual circumstances, and determined that it is not a serious offense. *See Brooks v. City of Seattle*, 599 F.3d 1018, 1028 (9th Cir. 2010), *rev'd in part, aff'd in part on other grounds, Mattos v. Agarano*, --- F.3d ---, 2011 WL 4908374 (9th Cir. 2011) (en banc) ("Although obstructing an officer is a more serious offense than [] traffic violations, it is nonetheless not a serious crime."); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (crime of obstructing an officer is not a serious offense sufficient to justify severe force).

1   4908374, at *8 (quoting *City of Hemet*, 394 F.3d at 702). Even if the court were to

2   assume that Mr. Baird posed a threat to Deputy Ehlers at the time that Mr. Baird suddenly

3   turned toward the officer after departing the bus, or at the time Mr. Baird allegedly tried to

4   kick or punch the deputy on the ground, once the two men were standing facing each other

5   approximately six feet apart the court cannot conclude that Mr. Baird continued to pose

6   any threat or flight risk. Mr. Baird's arms were outstretched, and his hands were

7   unclenched and visible. There is no evidence that Mr. Baird carried a weapon or that he

8   appeared ready to use one. The eyewitness testimony and videotape evidence is consistent

9   that Mr. Baird was neither threatening the officer nor attempting to flee at this point in

10   time. (*See* Diamondstone Decl. Ex. 4 (Harner Dep.) at 22-23; Bundy Decl. Ex. 9 (Wolf

11   Dep.) at 22, Ex. 3 (Video) Camera One at 00:13:30-38.)) Even Deputy Ehlers has

12   acknowledged these facts. (Diamondstone Decl. Ex. 3 (Ehlers Dep.) at 59-60.) Although

13   Mr. Baird was yelling at Deputy Ehlers to "Do it! Do it!," this type of verbal provocation

14   alone cannot justify the officer's use of an intermediate level of force – the use of his taser

15   in dart form, or the use of his taser in drive-stun mode.

16        The third governmental interest factor in the *Graham* test is whether Mr. Baird was

17   actively trying to resist arrest or attempting to evade arrest by flight. When Deputy Ehlers

18   maneuvered Mr. Baird to the ground, Mr. Baird refused to stay there. Deputy Ehlers

19   could have reasonably interpreted this behavior as resisting arrest. Mr. Baird also engaged

20   in some leg thrashing while on the ground, which Deputy Ehlers and other witnesses have

21   described as attempts by Mr. Baird to kick the officer. Mr. Baird, however, has denied

22   that he tried to kick the officer, and rather testified that when he found himself on the

ground he was simply confused about what was going, could not remember talking to an officer, and so instinctually stood back up. (Bundy Decl. Ex. 1 (Baird Dep.) at 32.)  In any event, the resistance, if any, is mild, and to the extent any resistance existed, it had ceased by the time Deputy Ehlers initially deployed his taser.  *See Smith*, 394 F.3d at 703 (plaintiff who ignored some of the officers' commands, only engaged in minor resistance because he did not attempt to run from officers and physically resisted for only a short period of time).

In *Mattos*, the Ninth Circuit found that officers may have found a plaintiff's uncooperative and agitated behavior potentially threatening while she sat in the driver's seat of her car following a traffic stop with her keys still in the ignition.  2011 WL 4908374, at *8.  However, once the keys were removed from the ignition, she no longer posed even a potential threat to the officers' safety, "much less an 'immediate threat.'"  *Id.* (citing *Deorle v. Rutherford*, 272 F.3d a1272, 1280 (9th Cir. 2001)).  Just as in *Mattos*, although Mr. Baird may have resisted arrest or posed an earlier threat to Deputy Ehlers when they scuffled on the ground, by the time Deputy Baird deployed his taser, and Mr. Baird was standing six feet away with his arms spread and his palms unclenched, he no longer posed an immediate threat to Deputy Ehlers, and was no longer actively resisting arrest or attempting to flee.

Finally, the court "must examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  *Mattos*, 2011 WL 4908374, at *8 (quoting *Bryan,* 630 F.3d at 826.)  The court notes that Mr. Baird was admittedly highly intoxicated and his behavior in response to

Deputy Ehlers was erratic to say the least.  He, therefore, bears some responsibility for the events as they unfolded here, and his responsibility "influences the totality of these circumstances." *See Mattos*, 2011 WL 4908374, at *9.[7]

The court, however, notes an additional factor, which is the number of times that Deputy Ehlers tased Mr. Baird within the short span of 60-75 seconds.  In *Mattos*, the Ninth Circuit noted that the officer tased the plaintiff "three times over the course of less than one minute."  *Id.*  The Ninth Circuit described this factor as "overwhelmingly salient," noting that "[t]hree tasings in such rapid succession provide[s] no time for [the plaintiff] to recover from the extreme pain . . ., gather [him]self, and reconsider [his] refusal to comply."  *Id.*; *see also Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1149 (W.D. Wash. 2007), *aff'd*, 301 Fed. Appx. 704 (9th Cir. 2008) ("[A]ny decision to apply multiple applications of a Taser must take into consideration whether a suspect is capable of complying with an officer's commands.").  Here, Mr. Baird was essentially tased four times in rapid succession (once in dart-mode, once in drive-stun mode, and two additional times when Deputy Ehlers reactivated his taser in drive-stun mode).  The court must consider the number of tasings Mr. Baird experienced and the time period in which he received them in weighing the reasonableness of the force deployed.

In short, although Mr. Baird was highly intoxicated and erratic in his behavior, his alleged offenses were minor.  He did not pose an immediate threat to Officer Elhers's

---

[7] For example, Mr. Baird's extreme intoxication and resulting erratic behavior weighs in favor of finding Deputy Ehlers's minimal use of force in removing Mr. Ehlers from the bus and placing him on the ground after he had been removed to be objectively reasonable.

safety or the safety of others. He was not actively resisting arrest or trying to flee at the time Deputy Ehlers deployed his taser. Finally, Deputy Ehlers tased Mr. Baird once in dart form, once in drive-stun mode, and activated his taser two more times in drive-stun mode – all in rapid succession over approximately 60-75 seconds.

The court finds the facts in *Bryan* to be instructive here. In *Bryan*, the plaintiff was stopped by an officer for failure to wear his seatbelt. The plaintiff was angry with himself at the prospect of another ticket and hit his steering wheel and yelled expletives to himself. After pulling his car over, the plaintiff stepped out of his car. The plaintiff was agitated, standing outside of his car, yelling gibberish, hitting his thighs, and clad only in his boxer shorts and tennis shoes. He did not verbally threaten the officer, was standing 15 to 25 feet away, and did not attempt to flee. The officer testified that the plaintiff took a step toward him, while the plaintiff testified that he did not take any steps. The physical evidence indicates that the plaintiff was actually facing away from the officer. Without giving a warning, the officer shot his taser and stunned the plaintiff resulting in injuries when he fell. *See generally, Bryan*, 630 F.3d at 824-32. Although the plaintiff in *Bryan* was not intoxicated, like Mr. Baird, he was highly agitated and yelling. Further, like Mr. Baird, he was stopped for a minor offense, was not an immediate risk to the officer, and was not resisting arrest or attempting to flee. If anything, Deputy Ehlers's use of force, in tasing Mr. Baird not once, but essentially four times in rapid succession, was less justifiable than the single taser deployment in *Bryan*.

Based on the totality of these circumstances, a reasonable fact-finder, taking the evidence in the light most favorable to Mr. Baird, could conclude that Deputy Ehlers's use

of an intermediate level of force when he deployed his taser in dart-mode, followed by the application of his taser in drive-stun mode, with two subsequent taser reactivations, all in rapid succession, was unreasonable and therefore constitutionally excessive. *See Mattos*, 2011 WL 4908374, at *9-10 (*comparing Bryan,* 630 F.3d at 832 (holding that the plaintiff alleged a constitutional violation where he was tased in dart mode even though he "was neither a flight risk, a dangerous felon, nor an immediate threat") *and Parker v. Gerrish*, 547 F.3d 1 (1st Cir. 2008) (upholding a jury verdict for excessive force used against a driver stopped for speeding who admitted to drinking, exchanged hostile words with an officer, and initially resisted arrest before being tased), *with Cook v. City of Bella Villa,* 582 F.3d 840 (8th Cir. 2009) (finding no excessive force where a lone officer tased a passenger of a car after he pulled the car over around midnight, three people got out of the car and immediately started yelling at the officer, and one passenger took a threatening step toward the officer)). A jury might draw inferences different from those that this court must entertain on a motion for summary judgment. Nonetheless, accepting the evidence in the light most favorable to Mr. Baird, whether the force employed by Deputy Ehlers was objectively reasonable, is a question of fact ordinarily reserved for the jury.

**2. Clearly Established Law**

Having determined that Mr. Baird has alleged a viable Fourth Amendment violation, the court must next consider whether Deputy Ehlers is nevertheless entitled to qualified immunity because the constitutional violation described above was not "'sufficiently clear' that every 'reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. Al-Kidd*, --- U.S. ---, 131 S.Ct. 2074, 2083

(2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The alleged violation

did not occur until November 23, 2009. The Ninth Circuit did not declare that a taser used

in dart mode constituted an intermediate use of force, and that the use of that weapon in an

analogous factual situation violated the Fourth Amendment, until the court's 2010

decision in *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). Further, the Ninth

Circuit's opinion in *Mattos*, analyzing the reasonableness of an officer's use of a taser in

drive-stun mode, was not issued until just this past month. *See Mattos,* 2011 WL

4908374.

     In *Bryan*, the Ninth Circuit granted the officers qualified immunity precisely

because the state of the law surrounding taser use was acknowledged to be murky as of the

date of the violation. *Id.* at 833; *see also Mattos*, 2011 WL 4908374, at *12 ("[A]lthough

[the plaintiff] has alleged an excessive force claim, the law [regarding reasonable use of a

taser] was not sufficiently clear at the time of the incident [in 2004] to render the violation

clearly established."). Although the events of this case occurred years after the events in

either *Bryan* or *Mattos*, little binding, on-point case law was issued between when the

incidents occurred in those two cases and November 23, 2009. *See, e.g.*, *Groves v. Croft,*

No. CV 10-101-BLG-RFC-CSO, 2011 WL 5509028, at *30 (D. Mont. Nov. 10, 2011) (As

of the date the officers shot [the plaintiff] with a taser in dart mode . . . no U.S. Supreme

Court or Ninth Circuit decision addressed the use of a taser in dart mode."); *Quyen Kim*

*Dang v. City of Garden Grove*, No. SACV 10-00338 DOC (MLGx), 2011 WL 3419609,

at *9 (C.D. Cal. Aug. 2, 2011). Given the lack of clarity in the case authority prior to the

Ninth Circuit's rulings in *Bryan* and *Mattos*, the court declines to find that a per se

proscription against taser use in situations like the one at hand was clearly established as of November 23, 2009.

Nevertheless, at oral argument, counsel for Mr. Baird argued that Deputy Ehlers was on notice that use of his taser would be unreasonable based on Magistrate Judge James P. Donohue's August 31, 2007 ruling in *Beaver v. City of Federal Way,* 507 F. Supp. 2d 1137 (W.D. Wash. 2007). The court concludes otherwise. The facts in *Beaver* are quite distinct from those at issue here. The plaintiff was a burglary suspect whom the officer found running from the scene. When the plaintiff refused to comply with his command to halt, the officer fired and struck the plaintiff with the first of five taser deployments. *Id.* at 1140. The plaintiff fell to the ground, but then propped himself up on his elbows. *Id.* at 1141. The officer fired again, and the plaintiff fell to the ground. *Id.* Before the second tasing, and after each firing of his taser, the officer commanded the plaintiff to lie on his stomach and extend his arms out to his sides. *Id.* The *Beaver* court, held that the first three tasings of the suspect were objectively reasonable. *Id.* at 1145. The court based this ruling largely on facts that the officer was alone with a felony suspect, who was under the influence of controlled substances, who had ignored the officer's commands to stop, and who was attempting to rise and flee. *Id.* The final two tasings, however, occurred after another officer had arrived on the scene. *Id.* at 1142. This factor weighed heavily in the *Beaver* court's analysis of the final two tasings. *Id.* at 1145 ("The analysis changes, however, with the arrival of [the second officer]."). Ultimately, the court concluded that these last two tasings were not objectively reasonable. *Id.* at 1146.

The fact that the *Beaver* court found that the final two tasings were unreasonable would not provide Deputy Ehlers with clear guidance concerning his circumstances because the court's analysis so heavily relied upon the presence of a second officer. Further, the court's conclusion that the first three tasings were objectively reasonable also would not provide clear guidance because the facts of the two cases are so disparate. In *Beaver*, the plaintiff was a felony suspect actively trying to flee the scene, while Deputy Ehlers was confronted with a highly intoxicated misdemeanor suspect who was not actively trying to flee or resist arrest. The fact that use of the taser (the first three times) was objectively reasonable in *Beaver* would not render its use clearly unreasonable in the circumstances confronting Deputy Ehlers. Accordingly, the court finds that a reasonable officer in Deputy Ehlers's shoes could have believed that use of his taser was permissible. For the foregoing reasons, the court grants Defendants' motion for summary judgment concerning Deputy Ehlers's qualified immunity with respect to Mr. Baird's federal 42 U.S.C. § 1983 claim.

## IV.    CONCLUSION

Based on the foregoing, the court GRANTS in part Defendants' motion for summary judgment with regard to the issue of Deputy Ehlers's qualified immunity with respect to Mr. Baird's 42 U.S.C § 1983 claim. The remainder of Defendants' motion for summary judgment (Dkt. # 24) is DENIED as MOOT based on the court's order (Dkt. # 53) granting the parties' November 17, 2011 stipulated motion dismissing Mr. Baird's

state law claims (Dkt. # 53).  The court also DENIES as MOOT Mr. Baird's motion for partial summary judgment (Dkt. # 21) based on the same court order (Dkt. # 53).

Dated this 20th day of November, 2011.


_____
JAMES L. ROBART
United States District Judge